Counsel of Record:
Daniel M. Hawke
Elaine C. Greenberg
Mary P. Hansen
G. Jeffrey Boujoukos
Christopher R. Kelly
Paul T. Chryssikos
Securities and Exchange Commission
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA 19106
Telephone: (215) 597-3100
Facsimile: (215) 597-2740

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> KEVIN L. DOWD, <br><br> Defendant. | Case No. <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission"), 701 Market Street,

Suite 2000, Philadelphia, Pennsylvania 19106, alleges as follows against defendant Kevin L.

Dowd ("Dowd"), whose last known address is 446 5th Avenue NW, Boca Raton, Florida 33432:

## SUMMARY

1.      Dowd, a securities industry professional employed by a registered broker-dealer

("Brokerage Firm"), participated in an insider trading scheme by tipping material nonpublic

information concerning the November 21, 2011 public announcement that Gilead Sciences, Inc.

("Gilead") would acquire Pharmasset, Inc. ("Pharmasset") to a friend and former business

associate ("Tippee 1") who bought Pharmasset securities and who, in turn, tipped his friend and

former business partner ("Tippee 2") who also bought Pharmasset securities.

2.     Dowd learned of Pharmasset's potential sale during the course of his duties and responsibilities at Brokerage Firm.  One of the largest clients of Dowd's branch office of Brokerage Firm was a member of Pharmasset's board of directors ("Director").  Several weeks prior to the public announcement of the sale, Director informed his primary contact, a Senior Vice President and Portfolio Manager ("Portfolio Manager"), in confidence as his financial adviser, that Pharmasset was involved in an auction process to sell the company.  Later, shortly before the transaction was announced, Director told Portfolio Manager that Pharmasset would be sold at a final purchase price in the high $130s per share.

3.     Portfolio Manager informed Dowd of the potential sale of Pharmasset and instructed Dowd to refrain from trading in or recommending Pharmasset securities to others.

4.     Dowd chose to ignore not only Portfolio Manager's instructions, but also the federal securities laws' prohibition on insider trading.  In breach of a duty he owed to Brokerage Firm, Dowd passed along, or "tipped," the material nonpublic information regarding the potential sale of Pharmasset to Tippee 1, who works as a penny stock promoter and who, in turn, tipped Tippee 2.  On Friday, November 18, 2011—the last trading day prior to the public announcement of Pharmasset's sale—Tippee 1 purchased Pharmasset securities within minutes of a call with Dowd, and Tippee 2 purchased Pharmasset securities within minutes thereafter after communicating with Tippee 1.

5.     Following the public announcement of Pharmasset's sale on the morning of Monday, November 21, 2011, the price of Pharmasset stock closed at $134.14 – an increase of $61.47, or 84.6%, from its closing price on the previous trading day.  Just a few hours after the announcement, Tippee 1 and Tippee 2 liquidated their entire positions in Pharmasset securities,

reaping a combined total of approximately $708,327 in illegal profits. In exchange for Dowd's profitable tip, Tippee 1 provided Dowd with a jet ski dock and $35,000.

6.    By knowingly or recklessly engaging in the conduct described in this Complaint, Dowd violated, and unless enjoined will continue to violate, Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78n(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5 & 240.14e-3].

## JURISDICTION AND VENUE

7.    The Commission brings this action pursuant to Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u-1] to enjoin such transactions, acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest and civil money penalties, and such other and further relief as the Court may deem just and appropriate.

8.    This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1 and 78aa].

9.    Venue in this District is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the District of New Jersey, and were effected, directly or indirectly, by making use of the means or instruments or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of a national securities exchange.

## DEFENDANT

10.    **Kevin L. Dowd**, age 37, resides in Boca Raton, Florida. Dowd worked as a registered representative in a branch office of Brokerage Firm in Aventura, Florida from 2005 through approximately late October 2012, at which point he was placed on leave. Dowd has

3

been friends with Tippee 1 for many years.  Dowd formerly worked with Tippee 1 at a company involved in the promotion of securities including penny stocks ("Stock Promotion Company").

## RELATED PERSONS AND ENTITIES

11.      **Pharmasset, Inc.**, before its acquisition by Gilead, was a publicly-traded clinical-stage pharmaceutical company based in Princeton, New Jersey, with a focus on the development of oral therapeutics for the treatment of hepatitis C virus.  Before it was acquired, Pharmasset's stock was traded on the Nasdaq Stock Market under the ticker symbol "VRUS."

12.      **Tippee 1**, age 39, resides in Delray Beach, Florida.  On information and belief, Tippee 1 is engaged in the business of promoting securities, which primarily consist of penny stocks.  From approximately 2000 through approximately late 2006 or early 2007, Tippee 1 worked at Stock Promotion Company, including during time periods when Dowd and Tippee 2 worked there.

13.      **Entity 1** is a Florida limited liability company with its principal place of business in Delray Beach, Florida.  Tippee 1 controls Entity 1 and is its sole member.  At all relevant times, Tippee 1 maintained an account in the name of Entity 1 at a securities brokerage firm headquartered in Shrewsbury, New Jersey.

14.      **Tippee 2**, age 38, lives in Boca Raton, Florida.  On information and belief, Tippee 2 is or was engaged in the business of promoting securities, including penny stocks.  From approximately 2003 through approximately 2005, Tippee 2 worked with Tippee 1 at Stock Promotion Company.

15.      **Entity 2** is a Florida corporation with its principal place of business in Boynton Beach, Florida.  In August 2011, Tippee 2 and another individual formed Entity 2 and opened a brokerage account in that entity's name at a securities brokerage firm based in Glenview, Illinois.

4

16.     **Director**, prior to Pharmasset's acquisition by Gilead, was a member of Pharmasset's board of directors.  He is one of the largest customers of the Aventura, Florida branch office of Brokerage Firm where Dowd worked.

17.     **Brokerage Firm** is a New York-based broker-dealer and investment adviser registered with the Commission with branch offices throughout the United States including one in Aventura, Florida, where Dowd worked.

18.     **Portfolio Manager** is a Senior Vice President and Portfolio Manager at the Aventura, Florida branch office of Brokerage Firm where Dowd worked.

19.     **Managing Director** is a Managing Director and Family Wealth Director at the Aventura, Florida branch office of Brokerage Firm where Dowd and Portfolio Manager worked.

20.     **Office Administrator** is a Group Administrator at the Aventura, Florida branch office of Brokerage Firm where Dowd, Portfolio Manager, and Managing Director worked.

## FACTS

### Dowd's Role at Brokerage Firm

21.     From 2005 through approximately late October 2012, Dowd worked as a financial adviser at an Aventura, Florida branch office of Brokerage Firm.  The branch office where Dowd worked specializes in, among other things, providing investment, wealth management, estate planning, insurance-related, and other services to corporate executives, directors, business owners and high net-worth individuals and families.

22.     At Brokerage Firm, Dowd had responsibility for, among other things, entering securities trades for customers and handling customer-related insurance matters.  Dowd was also asked, from time to time, to enter securities trades for Managing Director in Managing Director's

personal brokerage accounts.  At Brokerage Firm, Dowd reported to Portfolio Manager and also to Managing Director.

23.     Dowd owed his employer, Brokerage Firm, a fiduciary duty, or a similar duty arising from acceptance of a duty of confidentiality or from a relationship of trust and confidence, to keep the information of Brokerage Firm and its customers confidential and to refrain from tipping others material nonpublic information that he obtained through his employment.

24.     Brokerage Firm's policies and procedures mandated to its employees that: "[y]ou may never, under any circumstances, trade, encourage others to trade, or recommend securities, derivatives or other financial instruments while in the possession of material non-public information." The policies and procedures also specifically listed information relating to proposed or agreed mergers and acquisitions as examples of material nonpublic information. Brokerage Firm's policies and procedures further mandated that: "[y]ou must protect confidential information, regardless of its form or format, from the time of its creation or receipt until its authorized disposal," and specifically listed "acquisition or divestiture plans" as an example of confidential information.

25.     At Brokerage Firm, Dowd was required to take courses regarding Brokerage Firm's policies and procedures, and he completed at least one such course on the subject of insider trading in October 2010.  Dowd also completed a verification of compliance with Brokerage Firm's code of conduct in April 2011 and a verification of compliance with Brokerage Firm's code of ethics in May 2012.

## The Sale of Pharmasset, Inc.

26.     On September 2, 2011, Gilead made an initial offer to acquire Pharmasset for $100 per share in cash.  Following Gilead's initial offer, the parties engaged in discussions relating to a possible sale and, on October 7, 2011, Gilead increased its offer to acquire Pharmasset to $125 per share.

27.     After receiving the $125 per share offer from Gilead, during a meeting of Pharmasset's board of directors on October 11, 2011, the Pharmasset board determined that the company should contact other potential buyers and conduct an auction process, or "market check," designed to lead to a sale of the company at the most favorable price.

28.     On October 12, 2011, Pharmasset informed Gilead that it would conduct a confidential auction process in which pharmaceutical companies, in addition to Gilead, would be invited to analyze Pharmasset's confidential information and submit proposals to acquire it.

29.     Starting on October 12, 2011, Pharmasset's investment bankers contacted several other pharmaceutical companies to inquire as to whether they would be interested in exploring a possible acquisition of Pharmasset by participating in the auction process.

30.     In response to the inquiries of Pharmasset's investment bankers, several pharmaceutical companies, in addition to Gilead, expressed an interest in a possible acquisition of Pharmasset.  The companies participating in the auction process conducted due diligence of Pharmasset during October and November 2011.

31.     In connection with the auction process, Pharmasset and its investment banking firm set November 17, 2011 as the "bid date," or deadline, for prospective buyers to submit offers to acquire Pharmasset.

32.     By November 17, 2011, all potential buyers participating in the auction process, other than Gilead, had informed Pharmasset that they were no longer interested in pursuing an acquisition of Pharmasset, leaving Gilead as the sole potential purchaser of Pharmasset.

33.     On November 17, 2011, Gilead increased its offer to acquire Pharmasset to $135 per share.

34.     On Friday, November 18, 2011, Pharmasset's board of directors, along with certain executives based in the company's Princeton, New Jersey headquarters and the company's financial and legal advisers, convened telephonically to consider Gilead's increased offer to acquire the company for $135 per share.

35.     While in New Jersey, Director participated in the Pharmasset board meeting telephonically.  Director also communicated from New Jersey on that day via telephone with one or more of his advisers in the Aventura, Florida branch office of Brokerage Firm.

36.     Over the weekend of November 19, 2011 and November 20, 2011, Pharmasset's management informed Gilead's management that Pharmasset would agree to an acquisition at a purchase price of $137 per share.   After additional negotiations, Gilead agreed.

37.     At approximately 7:00 a.m. on Monday, November 21, 2011, Gilead and Pharmasset issued a press release announcing their agreement and the forthcoming commencement of a cash tender offer to acquire all outstanding shares of Pharmasset for $137 per share.  That price reflects a premium of approximately 89% over the trading price of Pharmasset stock on the previous trading day.  In response to this announcement, the price of Pharmasset stock rose $61.47, or 84.6%, to close at $134.14 on November 21, 2011, up from its $72.67 closing price on Friday, November 18, 2011.

### Dowd Obtained Material Nonpublic
### Information Regarding the Sale of Pharmasset

38.     Director is a longtime customer of Brokerage Firm and has used the Aventura, Florida branch office to advise and to assist him with respect to many aspects of his finances, including investments, tax and estate planning, insurance matters, and the holdings of Pharmasset securities that he accumulated as a result of his service on the company's board.

39.     Approximately six to eight weeks before the November 21, 2011 announcement of the acquisition of Pharmasset by Gilead, Director informed Portfolio Manager, in confidence as his financial adviser, that Pharmasset was engaged in an auction process involving a sale of the company, had attracted the interest of several large pharmaceutical companies, and was going to be sold.

40.     Soon after, while the potential sale of Pharmasset was nonpublic, Portfolio Manager informed Dowd that Pharmasset was involved in a process to sell the company.

41.     At a meeting among Dowd, Portfolio Manager, Managing Director and Office Administrator, Portfolio Manager and Managing Director instructed Dowd and Office Administrator that the branch office of Brokerage Firm, including Dowd, was prohibited from recommending or trading Pharmasset securities because the office had come into possession of material nonpublic information regarding the sale of Pharmasset.

42.     Portfolio Manager also directed Dowd to ensure that Managing Director did not trade Pharmasset securities in his personal brokerage accounts because, from time to time, Dowd was responsible for entering securities trades for Managing Director in his personal accounts.

9

### Dowd Learned that the Purchase Price for the Sale of
### Pharmasset Was Going to be in the High $130s Per Share

43.     Later, but prior to the public announcement of the acquisition of Pharmasset,

Director informed Portfolio Manager, again in confidence as his financial adviser, that the final

purchase price for the sale of Pharmasset was going to be in the high $130s per share.

44.     Shortly thereafter, but before the public announcement, Portfolio Manager

informed Dowd that the final purchase price for the sale of Pharmasset was going to be in the

high $130s per share.

### Relationships among Dowd, Tippee 1 and Tippee 2

45.     Dowd and Tippee 1 have known each other and been friends for many years.

46.     Dowd and Tippee 1 formerly worked together at Stock Promotion Company, a

company involved in promoting the sale of securities to investors.

47.     Tippee 1 is involved in the business of promoting the sale of securities, primarily

penny stocks, to investors.

48.     Tippee 1 and Tippee 2 have also known each other for many years.

49.     Tippee 2 is or was also in the business of promoting the sale of securities,

including penny stocks, to investors.

50.     From approximately 2003 through 2005, Tippee 1 and Tippee 2 worked together

at Stock Promotion Company.

### Dowd Tipped Tippee 1 Who, in Turn, Bought Pharmasset
### Securities Based on Material Nonpublic Information

51.     On Friday, November 18, 2011, the trading day before the announcement of the

acquisition of Pharmasset by Gilead, Dowd tipped Tippee 1 material nonpublic information

regarding the sale of Pharmasset.

52.     At approximately 9:32 a.m. on Friday, November 18, 2011, while Dowd was in possession of material nonpublic information regarding the sale of Pharmasset, Tippee 1 called Dowd. The call lasted approximately 13 minutes.

53.     Later that afternoon, at approximately 1:12 p.m., Dowd called Tippee 1. The call lasted approximately 32 seconds.

54.     Seven minutes later, at approximately 1:19 p.m., Dowd placed another call to Tippee 1. The call lasted approximately 20 seconds.

55.     Nine minutes after that, at approximately 1:28 p.m., Tippee 1 called Dowd. The call lasted approximately 28 seconds.

56.     On that same day, Tippee 1 wired $196,000 into his brokerage account in the name of Entity 1. Prior to this wire transfer, Tippee 1's brokerage account in Entity 1's name had a zero balance and had not been used for any transactions for over three months.

57.     At approximately 1:29 p.m.—around the same time as his last call with Dowd—Tippee 1 purchased 2,700 shares of Pharmasset stock at approximately $71.89 per share in his brokerage account in Entity 1's name. Tippee 1's brokerage firm entered this trade on his behalf from its Shrewsbury, New Jersey headquarters. Tippee 1's purchase of 2,700 shares of Pharmasset stock cost a total of $195,808, nearly the entire $196,000 wired into his brokerage account that same day.

58.     During one or more communications between Dowd and Tippee 1 between approximately 9:32 a.m. and approximately 1:29 p.m. on Friday, November 18, 2011, when Tippee 1 purchased 2,700 shares of Pharmasset stock in his Entity 1 brokerage account, Dowd tipped Tippee 1 material nonpublic information regarding the sale of Pharmasset.

11

59.    Tippee 1's November 18, 2011 purchase of 2,700 shares of Pharmasset stock in his Entity 1 brokerage account was made while he was in possession of, and on the basis of, material nonpublic information regarding the sale of Pharmasset provided to him by Dowd.

60.    Prior to purchasing 2,700 shares of Pharmasset stock on November 18, 2011 in his Entity 1 brokerage account, Tippee 1 had not traded any securities in that account for over five months and had not traded Pharmasset securities since at least January 1, 2011.  In addition, nearly all of the securities that Tippee 1 had previously purchased in that account, unlike Pharmasset, were penny stocks.

### Tippee 1 Tipped Tippee 2 Who, in Turn, Also Bought Pharmasset Securities Based on Material Nonpublic Information

61.    On Friday, November 18, 2011, Tippee 1 tipped Tippee 2 material nonpublic information regarding the sale of Pharmasset that was supplied to him by Dowd.  Following a number of communications with Tippee 1 on Friday, November 18, 2011, Tippee 2 also bought Pharmasset securities.

62.    At approximately 11:29 a.m. on Friday, November 18, 2011, Tippee 1 called Tippee 2.  The call lasted approximately 38 seconds.

63.    Within thirty minutes thereafter, at approximately 11:56 a.m., Tippee 2 called Tippee 1.  The call lasted approximately three minutes.

64.    Less than twenty minutes later, at approximately 12:13 p.m., Tippee 2 again called Tippee 1.  The call lasted approximately two-and-a-half minutes.

65.    Sixteen minutes later, at approximately 12:29 p.m., Tippee 2 called Tippee 1 for a third time.  The call lasted approximately 30 seconds.

66.    From approximately 1:25 p.m. to approximately 1:28 p.m., Tippee 1 and Tippee 2 sent each other six text messages.

67.     Within minutes, Tippee 2 sent two text messages to Tippee 1.

68.     Around the same time, Tippee 1 sent another text message to Tippee 2.

69.     About a minute later, Tippee 2 sent a text message to Tippee 1.

70.     At approximately 1:32 p.m., Tippee 2 began to purchase out-of-the-money Pharmasset call options in a brokerage account in the name of Entity 2.   Tippee 2's purchases took place about three minutes after Tippee 1's purchase of 2,700 shares of Pharmasset stock.

71.     An option gives the purchaser the option to buy or sell 100 shares of the underlying stock.  A "call option" gives the purchaser the right, but not the obligation, to purchase a security at a specified price, the "strike price," within a specific time period.  A buyer of a call option anticipates that the price of the underlying security will increase.  An "out-of-the-money" call option has a strike price that is higher than the current market price of the underlying stock and has no value at expiration unless the price of the underlying stock has risen higher than the strike price as of the expiration date.

72.     Between approximately 1:32 p.m. and 1:35 p.m. on Friday, November 18, 2011, Tippee 2 purchased 50 December 2011 call options with a strike price of $75 at an average price of $3.10 and 50 December 2011 call options with a strike price of $80 at an average price of $1.66 in the Entity 2 brokerage account.

### Dowd, Tippee 1, and Tippee 2 Engaged in Suspicious<br>Phone Calls Immediately After the Deal Announcement

73.     On Monday, November 21, 2011—the trading day after Tippee 1 and Tippee 2 purchased Pharmasset securities—at approximately 7:00 a.m., Gilead and Pharmasset issued a press release announcing their agreement and the commencement of a cash tender offer to acquire all outstanding shares of Pharmasset for $137 per share.  The price reflected a premium

13

of approximately 89% over the closing price of Pharmasset stock on Friday, November 18, 2011,

the day Tippee 1 and Tippee 2 bought Pharmasset securities.

74.     A few minutes after news of the sale of Pharmasset became public, at

approximately 7:04 a.m., Dowd placed two phone calls to Tippee 1.

75.     Between approximately 7:47 a.m. and 8:49 a.m., Tippee 1 and Tippee 2

exchanged approximately seven calls to each other's cell phones.

**Within A Few Hours of the Acquisition Announcement,
Tippee 1 and Tippee 2 Sold their Pharmasset Securities,
Realizing Illegal Profits Totaling Approximately $708,327**

76.     At approximately 10:23 a.m. on Monday, November 21, 2011, within only a few

hours of the 7:00 a.m. public announcement that Gilead would acquire Pharmasset, Tippee 1 sold

all 2,700 shares of Pharmasset stock he had purchased the previous Friday for $134.16 per share.

Tippee 1's brokerage firm entered this trade on his behalf from its Shrewsbury, New Jersey

headquarters.  Upon this sale, Tippee 1 realized approximately $163,621 in illegal profits.

77.     Between approximately 10:44 a.m. and 11:04 a.m. on Monday, November 21,

2011, Tippee 2 sold all of the Pharmasset call options he had purchased the previous Friday.  He

sold all 50 December 2011 $80 call options at an average price of $54.39 and all 50 December

2011 $75 call options at an average price of $59.33.  As a result of the trades, Tippee 2 realized

illegal profits of approximately $544,706.

78.     In a span of two trading days, Tippee 1 and Tippee 2 realized a total of

approximately $708,327 in illegal profits from their trades in Pharmasset securities based on

material nonpublic information regarding the sale of Pharmasset supplied by Dowd.

### Dowd Received a Benefit from Tippee 1 in
### Exchange For His Tip Regarding the Sale of Pharmasset

79.    Around the time that Tippee 1 purchased 2,700 shares of Pharmasset stock, Tippee 1 agreed to give—and ultimately gave—Dowd a dock to be used with his jet skis.

80.    After Tippee 1's profitable trades in Pharmasset securities, he also provided Dowd with thirty-five thousand dollars ($35,000) in the form of a cashier's check dated January 3, 2012 made payable to Dowd.  The $35,000 cashier's check was deposited into Dowd's bank account two days later, on January 5, 2012.

81.    Dowd used the $35,000 from Tippee 1 to pay for expensive upgrades to a pool at his house.

### Dowd Took Steps to Conceal His Illegal Tip to Tippee 1

82.    In approximately late October 2012, after he was aware of the Commission's investigation, Dowd attempted to enlist the support of two of his co-workers at Brokerage Firm in order to conceal his involvement in the insider trading of Pharmasset securities.

83.    Specifically, Dowd initiated a meeting with Portfolio Manager and Office Administrator at their Aventura, Florida branch office of Brokerage Firm in which Dowd advised them that the government was investigating possible insider trading in the securities of Pharmasset.

84.    Dowd reported that the government was looking into whether he had provided a friend with material nonpublic information concerning Pharmasset.   Attempting to conceal his misconduct, Dowd stated to Portfolio Manager and Office Administrator that he had not been advised of the sale of Pharmasset in advance of the public announcement on November 21, 2011. This statement was false.

85.    Shortly after this meeting, Brokerage Firm placed Dowd on leave.

**Dowd Violated the Federal Securities Laws**

86.     The information provided by Dowd to Tippee 1 regarding the sale of Pharmasset was material and nonpublic.  A reasonable investor would have viewed that information as important to his or her investment decisions.  Dowd knew, or was reckless in not knowing, that the information he received relating to the sale of Pharmasset that he passed on to Tippee 1 was material and nonpublic.  Among other things, Dowd knew, or was reckless in not knowing, that the information he received relating to the sale of Pharmasset that he passed on to Tippee 1 was from Director, who was on Pharmasset's board of directors.

87.     Dowd, pursuant to his employment relationship with Brokerage Firm and Brokerage Firm's policies and procedures, owed a duty of trust or confidence to Brokerage Firm to keep such information confidential.

88.     Dowd knowingly or recklessly breached this duty when he misappropriated the material nonpublic information regarding the sale of Pharmasset and tipped Tippee 1 such information, which ultimately resulted in the illegal trading in Pharmasset securities.

89.     Dowd had a reasonable expectation that Tippee 1 and any tippees of Tippee 1 would trade on the basis of and/or tip that information, or was recklessly indifferent to the same.

90.     Dowd tipped material nonpublic information regarding the sale of Pharmasset to Tippee 1 with the expectation of receiving a benefit.

91.     Dowd received a benefit in exchange for tipping material nonpublic information regarding the sale of Pharmasset to Tippee 1.

92.     At all times relevant to this Complaint, Dowd acted knowingly and/or recklessly.

## Dowd Tipped Tippee 1 in Connection with a Tender Offer

93.     By November 18, 2011, the date that Tippee 1 and Tippee 2 purchased Pharmasset securities based on material nonpublic information illegally supplied by Dowd, one or more substantial steps had been taken to commence the tender offer for Pharmasset securities.

94.     When Dowd tipped Tippee 1 with respect to the sale of Pharmasset, Dowd was in possession of material information concerning the tender offer for Pharmasset securities that he knew or had reason to know was nonpublic and that he knew or had reason to know had been acquired, directly or indirectly, from Pharmasset, the target company.

95.     When Dowd tipped Tippee 1 with respect to the sale of Pharmasset, he communicated material nonpublic information relating to the tender offer for Pharmasset securities under circumstances in which it was reasonably foreseeable that his communication was likely to result in a violation of the federal securities laws.

## FIRST CLAIM FOR RELIEF

## Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

96.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 95, inclusive, as if they were fully set forth herein.

97.     By engaging in the conduct described above, in or around November 2011, Dowd, knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

(a)     employed devices, schemes or artifices to defraud;

(b)      made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)      engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

98.      By engaging in the foregoing conduct, Dowd violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder.

## SECOND CLAIM FOR RELIEF

### Violations of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder

99.      The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 98, inclusive, as if they were fully set forth herein.

100.      By engaging in the conduct described above, in connection with a tender offer, Dowd, knowingly or recklessly, engaged in one or more fraudulent, deceptive or manipulative acts.

101.      By reason of the foregoing, Dowd violated, and unless enjoined will continue to violate, Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court enter a final judgment:

**I.**

Permanently restraining and enjoining Dowd from, directly or indirectly, violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3];

**II.**

Ordering Dowd to disgorge the ill-gotten gains or unjust enrichment derived by his direct and indirect tippees as set forth in this Complaint, together with prejudgment interest thereon;

**III.**

Ordering Dowd to pay a civil penalty up to three times the profits made pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

**IV.**

Granting such other and further relief as this Court may deem just, equitable, and necessary.

Respectfully submitted,

BY: _Mary P. Hansen_

Mary P. Hansen
Paul T. Chryssikos
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA  19106
Telephone: (215) 597-3100
Facsimile: (215) 597-2740

Of Counsel:

Daniel M. Hawke
Elaine C. Greenberg
G. Jeffrey Boujoukos
Christopher R. Kelly

## Certification

Pursuant to Local Rule 11.2, I certify that the matter in controversy alleged in the foregoing Complaint is the subject of a criminal action pending in this court, Case No.: 13-cr-6515. The United States is the plaintiff in that matter, and Kevin L. Dowd is the defendant in that case.

By: _____

Mary P. Hansen
Attorney for Plaintiff
Securities and Exchange Commission
701 Market Street, Suite 2000
Philadelphia, PA 19106

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

   v.

KEVIN L. DOWD,

      Defendant.

Case No.

**DESIGNATION OF AGENT FOR SERVICE**

Pursuant to Local Rule 101.1(t), because the Securities and Exchange Commission (the "Commission") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as eligible as an alternative to the Commission to receive service of all notices or papers in the above captioned action. Therefore, service upon the United States or its authorized designee, James Clark, Chief, Civil Division, United States Attorney's Office for the District of New Jersey, 970 Broad Street, 7th Floor, Newark, NJ 07102 shall constitute service upon the Commission for purposes of this action.

By:     *Mary P. Hansen*

Mary P. Hansen
Attorney for Plaintiff
Securities and Exchange Commission
701 Market Street, Suite 2000
Philadelphia, PA 19106